**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| Alyssa Enegren, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>v.<br><br>KC Lodge Ventures LLC, KC Lodge Ventures I, LLC, KC Lodge Ventures II, LLC, KC Lodge Ventures III, LLC, KC Lodge Ventures IV, LLC, St. Louis Lodge Ventures LLC, St. Louis Lodge Ventures I, LLC, St. Louis Lodge Ventures II, LLC, St. Louis Lodge Ventures III, LLC, and PB&J Restaurants, Inc.,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 17-CV-2285<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' UNOPPOSED MOTION TO
GRANT FINAL CERTIFICATION AND
<u>APPROVE COLLECTIVE ACTION SETTLEMENT</u>**

Plaintiffs seek the Court's approval of the Settlement reached in this conditionally certified Fair Labor Standards Act ("FLSA") collective action. Defendants also desire the Court's approval and thus do not oppose this Motion.

To effectuate a binding release, FLSA settlements generally require judicial approval. *Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1354 (11th Cir. 1982). A copy of the parties' Settlement Agreement ("Settlement Agreement" or "Settlement") is attached as Exhibit A. The Settlement is fair and equitable to all parties concerned. Accordingly, Plaintiffs request, without

opposition from Defendants or any objecting Plaintiffs, that the Court grant final certification of this collective action and approve the Settlement.[1]

### Matter before the Court

Named Plaintiff Alyssa Enegren, now known as Alyssa Nida,[2] filed this action alleging that Defendants failed to reimburse Twin Peaks Girls (certain waitstaff, bartenders, and hostesses) employed at their Twin Peaks restaurants for out-of-pocket costs incurred to purchase clothing items and accessories to comply with Defendants' uniform policies, and failed to compensate Twin Peaks Girls for time spent attending mandatory meetings, all of which served to reduce each Twin Peaks Girl's wages below the federal minimum wage.

With the goal of reaching a reasonable and prompt resolution, counsel for the parties discussed the potential for settlement of this case and, after focused written discovery, agreed to a process involving the stipulated conditional certification of the Named Plaintiff's FLSA claims, notice to all similarly situated Twin Peaks Girls, production of payroll and timekeeping data and personnel records for all Plaintiffs (both the Named Plaintiff and Opt-in Plaintiffs), and a structure for settlement discussions through mediation.

After the Court conditionally certified the case as a collective action, 102 Twin Peaks Girls elected to file consent forms and join this case as Opt-in Plaintiffs.

On February 21, 2019, the parties engaged in mediation with mediator Dennis Gillen. After a full day of arms-length, contentious negotiations, the parties agreed to a settlement that will

---

[1] Because Plaintiffs' motion is unopposed, Plaintiffs set forth the factual and procedural history of the case, the settlement terms, and the legal basis for approving the settlement within this motion itself, as opposed to a separate accompanying memorandum, in accordance with Local Rule 7.1(a)(1).

[2] Plaintiff legally changed her last name pursuant to her recent marriage. (Doc. 72).

provide substantial relief to all Plaintiffs. All of the Opt-in Plaintiffs were notified about the terms of the Settlement, and none of them have objected or even informally expressed any concern.

As set forth in the Settlement Agreement, a copy of which is attached as Exhibit A, Defendants will make payments towards a total Settlement Amount of $300,000, which includes expense reimbursement and back wage payments to the Named Plaintiff and Opt-in Plaintiffs (collectively "Plaintiffs"), a Service Award for the Named Plaintiff, and an amount for Plaintiffs' Counsel's attorney's fees and costs. As explained in more detail below, this Settlement is a fair and reasonable compromise of a bona fide dispute and should be approved.

### Facts and Procedural History

On May 17, 2017, Named Plaintiff filed a Complaint against Defendants asserting a minimum wage claim under the FLSA as a collective action under 29 U.S.C. §216(b). She claimed, on behalf of herself and other Twin Peaks Girls, that Defendants failed to reimburse Twin Peaks Girls for the cost of costumes and other mandatory uniform items that they were required to purchase and failed to pay them for various pre-shift working time, including time spent complying with Defendants' uniform guidelines and attending mandatory meetings. Because the Named Plaintiff and other Twin Peaks Girls were paid a sub-minimum wage pursuant to the FLSA's tip credit provisions, any unpaid working time or unreimbursed business expense necessarily reduced their wages below the federal minimum wage. (Doc. 1).

After an unsuccessful attempt at early resolution through mediation on January 29, 2018, Plaintiff filed an Amended Complaint. (Doc. 29). On February 13, 2018, Defendants filed an Answer, denying that the Named Plaintiff and other Twin Peaks Girls were not paid the requisite minimum wage and asserting various affirmative defenses. (Doc. 31).

From March through July 2018, the parties proceeded with discovery. The parties exchanged Rule 26 disclosures. Plaintiff served, and Defendants responded to, significant written discovery. During this process the Parties also agreed to, and the Court approved, equitable tolling of the statute of limitations for potential Opt-in Plaintiffs from June 6, 2018, through the parties' eventual stipulation for conditional certification. (Doc. 44).

On August 31, 2018, after substantial discussion, the parties filed a joint motion stipulating to conditional collective action certification and asking the Court to approve the parties' proposed Notice to the class and Opt-in Consent Form. (Doc. 54). On September 10, 2018 the Court granted that motion. (Doc. 55).

Plaintiffs mailed the Court-approved Notice to putative class members. The Notice advised them of their right to join the case and advised those who joined this case of the terms and conditions under which they were joining:

> If you choose to join this lawsuit, … you will be bound by any ruling, settlement, or judgment, whether favorable or unfavorable, on the claims asserted. By joining this lawsuit, you designate the Named Plaintiff as your representative, and to the fullest extent possible, to make decisions on your behalf concerning the case, the method and manner of conducting the case, the entering of an agreement with Plaintiff's counsel regarding payment of attorneys' fees and court costs, the approval of settlements, and all other matters pertaining to this lawsuit.

(Doc. 54a, ¶ 9).

The Notice also advised:

> If you choose not to join this lawsuit, you will not be affected by any ruling, judgment, or settlement rendered on the claims asserted in this case, whether favorable or unfavorable.

(*Id.* ¶ 10).

In addition, to join the case, putative Opt-in Plaintiffs were required to file a Consent form. The Court-approved Consent form provides:

> I hereby consent to be a party plaintiff seeking unpaid wages against [Defendants] …. I designate the Named Plaintiff to make all decisions on my behalf concerning the method and manner of conducting the case including settlement, the entering of an agreement with Plaintiffs' counsel regarding payment of attorneys' fees and court costs, and all other matters pertaining to this lawsuit. For purposes of this lawsuit, I choose to be represented by Foulston Siefkin LLP and other attorneys with whom they may associate.

(*Id.* at p. 5). A total of 102 Twin Peaks Girls filed Consents to become party Opt-in Plaintiffs. (Docs. 56, 58, 59, 60, 61, 62, 63, 64, 65, 66, 68).

Through discovery, and a separate agreement reached between the parties as part of the conditional certification process, the parties exchanged a significant amount of information, including documents and electronically stored information regarding Defendants' uniform requirements and payroll, timekeeping, and personnel records for every Plaintiff.

On February 21, 2019, the parties engaged in mediation with Dennis Gillen, an experienced and highly regarded mediator who has conducted thousands of mediations. After a full day of arms-length and contentious negotiations, the parties, with Mr. Gillen's able assistance, were able to reach what they each believed to be a fair, reasonable, and adequate resolution of the dispute, taking into account the costs, risks, and delays of further litigation through trial and appeal. The terms of this Settlement are set forth in the Settlement Agreement. (Ex. A).

On March 5, 2019, Plaintiffs' Counsel notified all Opt-in Plaintiffs' by e-mail that a Settlement had been reached and to expect a letter containing information as to its terms.[3] On March 29, 2019, Plaintiffs' Counsel mailed a letter to each Opt-in Plaintiff notifying her of the material terms of the Settlement, including the total amount of the Settlement, her portion of the

---

[3] Plaintiffs' Counsel had previously corresponded with the Opt-in Plaintiffs via e-mail, and thus had a valid e-mail address for each Opt-in Plaintiff. None of the e-mails sent by Plaintiffs' Counsel to the Opt-in Plaintiffs were returned as undeliverable. (Declaration of Forrest T. Rhodes, Jr., (¶ 3), attached as Exhibit B.)

Settlement, a description of the allocation factors, a timeline for payments, the proposed Incentive Award to the Named Plaintiff, and a not-greater-than amount that Plaintiffs' Counsel would seek for its attorney's fees and costs. The letter also notified each Opt-in Plaintiff of the scope of the release of claims she would be providing in exchange for the settlement. The letter provided a dedicated phone number and e-mail address for any questions and notified each Plaintiff of her right to object to the settlement and the timeframe (21 days) and process for raising any objections. (Ex. B, ¶ 5).

Only a handful of letters were returned by the Postal Service. In each case, the affected Opt-in Plaintiff was personally contacted, and a copy of the letter was forwarded (and confirmed) via e-mail. (Ex. B, ¶ 6). Thus, to the best of Plaintiffs' Counsel's knowledge, each Opt-in Plaintiff received her letter.

Plaintiffs' Counsel received numerous follow-up calls from Opt-in Plaintiffs expressing their happiness and gratitude. None of the Opt-in Plaintiffs raised an objection or otherwise responded negatively to any aspect of the Settlement. (Ex. B, ¶ 7).

### Settlement Terms

The Settlement Agreement contains the terms of the payments to Plaintiffs, (Ex. A). The Settlement requires Defendants to pay a total of $300,000 ("Settlement Amount"), which will provide each Plaintiff with a combination of an expense reimbursement (for incurred uniform expenses) and a payment for unpaid working time, in exchange for a release of each Plaintiff's claims under federal and state wage and hour laws, and any claims under state wage payment laws that arise from the same facts as those asserted in this case. This is a limited release, not a general release.[4]

---

[4] The Named Plaintiff, in contrast, is signing a general release.

The Settlement Agreement includes an attachment that lists every Plaintiff and the amount of her settlement payment and the timeline for her payments. Each Plaintiffs' settlement payment is based on a formula that Plaintiffs' Counsel developed that accounts for her total period of employment, the number of shifts she worked, and her average hourly wage. (Ex. A ¶ A.2; Ex. B ¶ 8). Regarding uniform reimbursements, Plaintiffs who worked over a shorter period of time will receive smaller reimbursement amounts, and those who worked over a longer period of time will receive more. The portion of the settlement for unpaid meeting time is allocated based on the actual number of shifts worked by each Opt-In Plaintiff. All of the calculations are limited to the Opt-in Plaintiff's period of employment within the statutory recovery period (which varies based on the date each Consent Form was filed pursuant to 29 U.S.C. § 256(b)), with adjustments to reflect the Court's tolling order. The Settlement also provides for a Service Award to the Named Plaintiff, but for whom the case would not have been filed, and who expended considerable effort and undertook significant risk to prosecute this case for the benefit of the Opt-in Plaintiffs who will recover under this Settlement.

Notably, this is not a "claims-made" settlement; all monies from the Settlement Amount will be paid out. Attorneys' fees and costs will be paid out of the Settlement Amount. The total Settlement Amount will be paid in four installments, with one-half of the total being paid shortly after the Court approves the Settlement, and the remaining one-half to be paid in three equal installments in August 2019, February 2020, and August 2020. All amounts to be paid from the Settlement will be allocated on a pro-rata basis across the overall payment timeline. Thus, neither any of the Opt-in Plaintiffs, the Named Plaintiff, nor Plaintiffs' Counsel will receive a greater percentage of her or its respective portion of the Settlement Amount faster than anyone else.

### Legal Basis to Approve the Settlement

Settlement of an FLSA collective action generally requires court approval because private settlements do not effectuate a valid release. *See Hoffman v. Poulsen Pizza LLC*, No. 15-2640-DDC-KGG, 2017 U.S. Dist. LEXIS 459, at *8 (D. Kan. Jan. 3, 2017) (relying on *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982)). When a case has previously been only conditionally certified as a collective action, the Court must first grant final certification by determining that the Named Plaintiff and Opt-in Plaintiffs are "similarly situated" as required by the FLSA. *See Hoffman*, 2017 U.S. Dist. LEXIS 459, at *9-10 (relying on *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2001)). *See generally* 29 U.S.C. § 216(b). After granting final certification, the Court must then confirm that the proposed settlement is a fair and reasonable resolution of a bona fide dispute. *See Hoffman*, 2017 U.S. Dist. LEXIS 459, at *12. Here, there is no question that all of the Plaintiffs are similarly situated and that the Settlement is fair and reasonable. Accordingly, the Court should grant final collective action certification and approve the parties' Settlement.

**I.     The Court should grant final collective action certification because the Plaintiffs are similarly situated.**

The Tenth Circuit sets out three factors relevant to final collective action certification: "(1) the disparate factual and employment settings of individual plaintiffs; (2) various defenses available to defendant[s] which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Hoffman*, 2017 U.S. Dist. LEXIS 459, at *9-10 (following *Thiessen*, 267 F.3d at 1102-03). In this case, the parties agree for purposes of settlement, and there is no real question, that all three factors are satisfied.

As to the first factor, the factual and employment settings of the Plaintiffs were similar, not disparate. Each Plaintiff worked as a Twin Peaks Girl at one of Defendants' Twin Peaks franchised

restaurants. They had common job descriptions and performed common duties focusing on the sale of food, beverage, and merchandise to guests. Moreover, all Plaintiffs were subject to personnel policies that were the same in substance for all restaurants, including common uniform guidelines, which included the expectation to participate in periodic special events and "costume parties." Explanatory material regarding the various events where special costumes were required was provided by Defendants to the Plaintiffs and did not vary from store to store. In sum, all Plaintiffs were subject to the same uniform policies.

Second, no defenses that are individual to each Plaintiff or certain Plaintiffs have been raised in the case. To the contrary, one of Defendants' primary defenses is that the clothing items at issue are of a general type that could be worn in other settings such that those items are not primarily for the employer's benefit. If Defendants were to prevail on this argument, it would equally impact the claims of all Plaintiffs. *See Hoffman*, 2017 U.S. Dist. LEXIS 459, at *11.

The third *Thiessen* factor, fairness and procedural considerations, also weighs heavily in favor of final collective action certification. Allowing the case to proceed collectively provides a fairer approach to litigation for the Plaintiffs in that they can pool their resources to more efficiently address their claims. *See Hoffman*, 2017 U.S. Dist. LEXIS 459, at *12. "Also, the policy encouraging settlement of litigation favors final collective action certification." *Id.*

## II.     The Court should approve the Settlement because it is fair and reasonable.

In approving FLSA collective action settlements, this Court utilizes a three-factor inquiry as to whether "(1) the litigation involves a bona fide dispute, (2) the proposed settlement is fair and equitable to all parties, and (3) the proposed settlement contains an award of reasonable attorneys' fees." *Hoffman*, 2017 U.S. Dist. LEXIS 459, at *12. Here, all three factors support the Settlement.

### A. The litigation involves a bona fide dispute.

There is no question that there are serious factual and legal disputes in this case and that the Settlement is the product of hotly contested litigation. As evidenced by the pleadings, Defendants deny most of Plaintiffs' material factual allegations and assert numerous defenses that they argued would defeat Plaintiffs' claims in whole or in part. Moreover, while the parties agreed to engage in pre-mediation written discovery, Defendants challenged the scope of Plaintiffs' discovery, requiring numerous conferral sessions and eventually the assistance of Magistrate Judge Birzer. As to the merits, Plaintiffs allege that Defendants violated the FLSA because they failed to pay Plaintiffs minimum wages, after subtracting un-reimbursed uniform expenses and accounting for certain unpaid working time attending meetings. Defendants deny these allegations and contend that the scope of uniform items that Plaintiffs purchased were not required, and that these items were not within the category of expenses primarily for the employer's benefit for which reimbursement would otherwise be required. Defendants further deny that Plaintiffs were required to attend meetings off the clock such that Plaintiffs were not underpaid compared to minimum wage.

If Plaintiffs' allegations ultimately proved correct, Defendants would be faced with the prospect of a substantial monetary verdict, as well as an obligation to pay legal fees and costs incurred by Plaintiffs to prosecute the case through trial and possibly appeal. If Defendants' arguments proved correct, then Plaintiffs might obtain less recovery than they are getting in this settlement and potentially no recovery at all. In short, "the claims in this case present a bona fide dispute whether defendants violated the FLSA, with the potential for either side to prevail if the case continued." *Hoffman*, 2017 U.S. Dist. LEXIS 459, at *14 (finding bona fide dispute in FLSA case involving unreimbursed expenses).

### B.      The Settlement is fair and equitable to all parties.

To be fair and reasonable, the settlement "must provide adequate compensation to the employee and must not frustrate the FLSA policy rationales." *Koehler v. Freightquote.com, Inc.*, No. 12-2505-DDC-GLR, 2016 U.S. Dist. LEXIS 48597, at *54 (D. Kan. Apr. 11, 2016). This is often assessed against the factors that apply to class action settlements under Rule 23(e). Those factors include: "(1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable." *Id.* Other factors, such as the extent that Plaintiffs are notified of the settlement and have an opportunity to object, and the method that settlement proceeds are allocated among the Plaintiffs, are also relevant to the fairness inquiry. *Id.* at *57 (discussing other factors relevant to the fairness inquiry). However, in considering these factors, it is important to keep in mind that the Court should not go out of its way to look for reasons that might undermine the conclusion that the Settlement is fair. *See Foster v. Robert Brogden's Olathe Buick GMC, Inc.*, No. 17-2095-DDC-JPO, 2019 U.S. Dist. LEXIS 31751, at *15 (D. Kan. Feb. 28, 2019). Considering all factors, it is clear that the Settlement is fair and equitable to all parties.

### a.      The settlement was fairly and honestly negotiated.

The parties, through experienced counsel, resolved the case through arms-length negotiations over a day-long mediation with Dennis Gillen, an experienced mediator.

### b.   Serious questions of law and fact place the outcome of the case in doubt.

This case involves serious areas of dispute. With respect to the reimbursement claim, these issues include: (i) what clothing items were required by Defendants' uniform guidelines; (ii) the manner in which the guidelines were enforced by Defendants' management; (iii) whether the clothing items and accessories were of such a general nature that they were not reimbursable business expenses; and (iv) the sufficiency of evidence in support of the Plaintiffs' clothing and related purchases. Disputes also surround the claims regarding unpaid work time, including whether attendance at the meetings was required and the amount of allegedly uncompensated meeting time, especially in light of conflicting timekeeping records. The resolution of these disputed issues would have significantly impacted the outcome of the case. If these questions resolved in Defendants' favor, Plaintiffs potentially would have been left with no recovery.

### c.   The value of an immediate recovery outweighs the mere possibility of future relief after considering the costs, risks, and delay of litigation.

Absent the settlement, the parties would face protracted and expensive litigation. Defendants' operations are geographically spread across Defendants' six restaurants from south-central Kansas to eastern-Missouri, and the Plaintiffs are even more geographically diverse as some have relocated away from where they lived when working for Defendants. Defendants expressed an intention to depose all, or at least a substantial majority, of the 103 Plaintiffs, and Plaintiffs' Counsel would have had to depose on-site managers at each of Defendants' restaurants as well as some of Defendants' corporate office employees.

This significant discovery, combined with the likelihood of dispositive motions from both sides, a potential motion from Defendants to decertify the conditionally certified class, and an

eventual jury trial, meant that, absent settlement, any resolution to this case is multiple years away at considerable cost. And, as discussed above, there are serious disputes of law and fact, placing the outcome in doubt for all parties. The proposed settlement brings substantial value to each Plaintiff now. The settlement amounts to be paid to each Plaintiff are listed on "Exhibit A" to the Settlement Agreement. Although it's possible that recovery at trial could have been greater than the sums received under the Settlement Agreement, it's also possible the recovery would have been less, or nothing at all.

### d.     The parties believe the Settlement is fair and reasonable.

The Court should also consider the judgment of the parties and their counsel that the Settlement is fair and reasonable. Here, the Named Plaintiff, acting as a duly authorized representative of the Opt-in Plaintiffs, and the Defendants, represented by their representative, all of whom were represented by experienced counsel, agreed to a Settlement they believed was fair and reasonable.

Moreover, after the proposed Settlement was reached, Plaintiffs' Counsel notified all of the Opt-in Plaintiffs of the terms of the Settlement, including the amount each Plaintiff would get, the amount of the Service Award to the Named Plaintiff, and a maximum amount Plaintiffs' Counsel would seek for attorneys' fees and costs. In addition, the Opt-in Plaintiffs were afforded an opportunity to ask questions and/or assert objections to these Settlement terms. None of the Opt-in Plaintiffs objected to the proposed distribution the Settlement Amount or any other term of the Settlement. Many Opt-in Plaintiffs affirmatively expressed happiness and gratitude to Plaintiffs' Counsel, and a few of them reached out to the Named Plaintiff and thanked her.

Thus, all of the parties, including the Opt-in Plaintiffs—under the FLSA and the terms of the conditional certification, each Opt-in Plaintiffs is considered a party plaintiff to the case, not

merely a class member in the nature of Rule 23—have expressed their belief that the Settlement is fair and reasonable as to all parties

### e.    Other factors also support the fairness of the settlement.

Separate from the Rule 23(e) factors, some courts have looked at other factors that impact fairness, such as whether notice was provided to the proposed settlement class and the method by which settlement proceeds are allocated.

Here, after the Settlement was agreed to in principle at mediation, Plaintiffs' Counsel contacted all of the Opt-in Plaintiffs and provided them with a letter setting forth the material terms of the Settlement, including the overall Settlement Amount, how the settlement would be divided, a description of the factors used to allocate the settlement among Plaintiffs, how much that Plaintiff would receive, how the settlement payments would be reported for tax purposes, the timing of the settlement payments, the amount of the proposed Service Award for the Named Plaintiff, the proposed amount of attorney's fees and costs to be paid to Plaintiffs' Counsel, and a description of the limited release that would impact each Opt-in Plaintiff. The letter provided a dedicated phone number and e-mail address for any questions and provided a three-week time frame and process for raising any objections. No objections were received; to the contrary, many Plaintiffs called to express their gratitude and satisfaction with the settlement. (*See supra* pp. 5-6). These efforts further demonstrate fairness and should obviate the need for a hearing. *See Stubrud v. Daland Corp.*, No. 14-2252-JWL, 2015 U.S. Dist. LEXIS 114505, at *5 (D. Kan. Aug. 28, 2015) (noting that a fairness hearing is unnecessary when the opt-in plaintiffs had notice of the settlement and an opportunity to object); *Stubrud v. Daland Corp.,* No. 14-2252-JWL (D. Kan. Oct. 13, 2015) (unpublished order approving settlement without a hearing) (attached as Exhibit C).

Plaintiffs' Counsel developed the settlement allocation formula to provide an inherently fair method of distributing the settlement monies. Plaintiffs' uniform expense claim is largely based on certain themed events ("costume parties"), with a different costume party each month along with other interspersed special events. Thus, Plaintiffs' Counsel felt it important to consider the overall period of each Plaintiff's employment (which made the Plaintiff subject to multiple different events). The allocation formula considers each of these factors. With respect to the unpaid meeting time component, as pre-shift meetings were a regular occurrence, the formula distributes monies for this aspect based on the actual number of shifts worked by each Plaintiff, with a separate allocation for monthly meetings based on months of employment, all measured within the recovery period applicable to each Plaintiff. In sum, the settlement proceeds are distributed pro-rata among the Plaintiffs based on factors that are directly relevant to the alleged damages.

**III.    The Court should approve the requested Service Award for the Named Plaintiff.**

Courts recognize that the risk, time, and substantive assistance that a class representative devotes to a lawsuit that inures to the common benefit of others warrants a service award above and beyond what the typical class member receives. *See USFW Local 880-Retail Food v. Newmont*

*Mining Corp.*, 352 Fed. Appx. 232, 235 (10th Cir. 2009).[5] The Tenth Circuit instructs that the amount of a service award is related to (1) the personal risk incurred and (2) the effort expended for the benefit of the class. *See id.* at 235. These and other factors support the requested $15,000 Service Award to the Named Plaintiff, Alyssa Nida.

**A.      The Named Plaintiff took on significant risk to pursue this case.**

Without aid or support from her fellow co-workers, Ms. Nida, née Enegren, ventured out as the lone plaintiff and class representative. As a solo Named Plaintiff, she became a potential lightening rod, assuming significantly more personal risk and burdens than plaintiffs in other cases who proceed as a group.

After asserting legal claims, co-workers told Ms. Nida that some of the managers, as well as some of her co-workers, were upset at her and saying bad things about her at work. This was extremely stressful for her, and she did not believe she could return to work without harm to her mental health. Nor did she believe she could use Twin Peaks as a reference to obtain new employment. As a result, she suffered 16 weeks of lost income until she found another job with comparable income. (Ex. D, ¶ 8).

---

[5] *See also*, *e.g.*, *Nolen v. Firebird of Overland Park LLC*, No. 2:17-CV-02237 (D. Kan. Jan. 3, 2019) (preliminarily approving $15,000 service awards to the named plaintiff and an early opt-in plaintiff in FLSA and state law wage-and-hour case); *Koehler v. Freightquote.com, Inc.*, No. 12-2505-DDC-GLR, 2016 U.S. Dist. LEXIS 91745 (D. Kan. July 13, 2016) (approving $30,000 total in service awards to four named plaintiffs in FLSA case); *Tussey v. ABB, Inc.*, 06-04305-CV-C-NKL, 2012 WL 5386033 (W.D. Mo. Nov. 2, 2012) (approving $25,000 service awards for three class representatives); *Wolfert v. UnitedHealth Group, Inc.*, No. 4:08CV01643(TIA), at *4 (E.D. Mo. Aug. 21, 2009) (approving $30,000 incentive award); *Matheson v. T-Bone Rest., LLC*, 2011 WL 6268216, at *9 (S.D.N.Y. Dec. 13, 2011) (approving $45,000 service award to named plaintiff in tip pool/OT case settlement); *Mentor v. Imperial Parking Sys., Inc.*, 2010 WL 5129068, at *5 (S.D.N.Y. Dec. 15, 2010) (approving $40,000 service Award to named plaintiff in FLSA settlement); *Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) (approving $30,000 service award to named plaintiff in FLSA settlement); *Flores v. Anjost Corp.*, 2014 WL 321831, at *9 (S.D.N.Y. Jan. 29, 2014) (approving $25,000 service awards for five named plaintiffs in FLSA settlement); *Duchene v. Michael Cetta, Inc.*, 2009 WL 5841175, at *3 (S.D.N.Y. Sept. 10, 2009) (approving $25,000 service award to named plaintiff in tip pool case); *Capsolas v. Pasta Res. Inc.*, 2012 WL 4760910, at *9 (S.D.N.Y. Oct. 5, 2012) (approving $20,000 service award for named plaintiff in tip credit case).

Ms. Nida was alienated from and shunned by former co-workers she had considered friends. They would no longer take or return her calls. She was told that one of Defendants' store managers had told them not to have any contact with her because she was asserting legal claims. (Ex. D, ¶ 9).

Ms. Nida will forever be subject to background checks on employment applications, and there is a risk that if a potential employer learns about this lawsuit it will be less likely to hire her.

### B.   The Named Plaintiff provided extraordinary and invaluable services to the collective.

All told, Ms. Nida spent at least 131 hours working on or providing support to this case. (Ex. D, ¶ 11). Among other things, Ms. Nida: provided Plaintiffs' Counsel with documents and information necessary for their investigation into the allegations that would form the basis of this lawsuit; reviewed the allegations in the complaint prior to the filing of the action; helped formulate document and information requests; identified and contacted potential witnesses; met with counsel in person at least 11 times (not including two mediation days) and communicated with counsel by phone and text message on a regular basis (at least 54 times) over the past two years to share new information when she learned it, answer questions, stay informed about the case, and work with counsel to make strategic decisions; and attended two day-long mediations and was an active participant in arriving at the ultimate monetary recovery. (*Id.*). These services were truly invaluable, given that Ms. Nida was the *only* Twin Peaks Girl to step forward, engage counsel, and bring and prosecute the case as a Named Plaintiff.

This Court has previously approved $5,000 service awards to two named plaintiffs who had devoted 39.2 and 19.6 hours, respectively, to their case. *See Koehler*, 2016 U.S. Dist. LEXIS

91745, at *10.[6] Ms. Nida's requested Service Award equates to a lower pro rata recovery than both of those awards (only 45% as much as the coat-tail riding plaintiff who received $5,000 for working 19.6 hours on her case). Moreover, because there were no other Named Plaintiffs or early Opt-in Plaintiffs, all of the time Ms. Nida devoted to the case was truly invaluable, as none of it was duplicative of work contributed by others, which was the case in *Koehler* and most other cases.[7]

Moreover, Ms. Nida, has demonstrated beyond the plaintiffs in *Koehler* and *Hoffman*, that she missed two full days of work and several partial days to prosecute this case, thus losing out on the income she would have earned those days. Factoring in her lost income, as well as her significant personal risk, the requested Service Award, in relation to her effort, is eminently reasonable.

### C.      Other factors also support the requested Service Award.

Other factors present in this case also support the Named Plaintiff's requested Service Award. First, all of the Opt-in Plaintiffs have been informed of the Settlement terms, including the Service Award. None of them objected or even informally expressed any concern. To the contrary, all of the feedback has been positive.

Second, Ms. Nida, unlike the Opt-in Plaintiffs, is releasing *all claims*, not just wage-and-hour claims, as a condition of settlement. This additional consideration further supports the requested Service Award.

---

[6] This order approved a renewed motion to approve $30,000 in service awards to four named plaintiffs: $5,000 to a plaintiff with 19.6 hours; $5,000 to a plaintiff with 39.2 hours; $10,000 to a plaintiff with 137.75 hours; and $10,000 to a plaintiff with 218.5 hours.

[7] The requested Service Award is also roughly in line, on a pro rata basis, with this Court's approval of a $2,000 award to a plaintiff who estimated that he devoted about 25 hours to work on his lawsuit. *See Hoffman*, 2017 U.S. Dist. LEXIS 459, at *17. *See also* cases cited in footnote 5 in which courts have approved service awards greater than or equal to the one sought here.

Third, while not one of the factors identified by the Tenth Circuit in *USFW Local 880-Retail Food*, courts sometimes compare the amount of a requested service award to the total settlement as a cross-check. In *Koehler*, this Court recognized FLSA cases in which service awards representing 8.4% and 5% of the total settlement have been approved as reasonable. *See* 2016 U.S. Dist. LEXIS 91745, at *10-11. Here, the requested Service Award is 5% of the total settlement and thus falls within an accepted reasonableness range.[8] Moreover, it is our understanding that Defendants made changes to some of their practices after this lawsuit was filed, so Ms. Nida's efforts will provide greater benefits to class members who are still employed (and other current and future employees) than just the amount of the settlement.

### D. Conclusion

Ms. Nida chose to step forward and bring this lawsuit to right a wrong and help others like her. As the Tenth Circuit recognizes, individuals should be rewarded for undertaking the risks and expending the effort to bring legal actions like this one. Such awards encourage others who have not been paid in compliance with the FLSA to assert their rights and improve the landscape for all employees.

The requested Service Award is fair and reasonable in light of the following factors, which, as a whole, make Ms. Nida's circumstances unique compared to other litigants who have sought service awards in FLSA cases in Kansas:

---

[8] While the Court found the first-proposed service awards in *Koehler* unreasonable, this was based on the *USFW Local 880-Retail Food* factors—(1) the amount of time the plaintiffs spent working on the lawsuit and (2) the personal risk they took by bringing the lawsuit—not their proportion to the total settlement. *See Koehler v. Freightquote.com, Inc.*, No. 12-2505-DDC-GLR, 2016 U.S. Dist. LEXIS 48597, at *68-70 (D. Kan. Apr. 11, 2016).

- The personal risk assumed, which was more significant than in most cases because she was acting by herself, without support from others, leaving her particularly vulnerable to reputational risk and alienation from her peers (which were in fact realized).

- The significant time devoted to the case, which put the requested Service Award within the range, on a pro rata basis, of other awards approved by the Court.

- The significant lost income incurred as a result of the bringing the case.

- The general release of all claims.

- All Opt-in Plaintiffs were informed about the requested Service Award and none objected or expressed concern.

The bottom line is that no one else was willing to put it all on the line and assume the personal risk, expend the effort, and incur the costs necessary to pursue this lawsuit. But for this brave young woman's fortitude and sacrifice, there would be no case, there would be no Settlement, none of the Opt-in Plaintiffs would be receiving anything, and Defendants would not have changed some of their business practices. That deserves to be appropriately rewarded. The Court should approve the requested $15,000 Service Award.

## IV.   Plaintiff's Counsel should be awarded their fees and expenses.

By separate fee application, Plaintiffs' Counsel also request approval of their attorneys' fees and reimbursement of expenses incurred in this case since its inception and for future expenses that will be incurred in connection with administering the settlement payments. Plaintiffs' Counsel are seeking an award of $120,000 out of the Settlement Amount as a fee (the Settlement Agreement provided for a fee of no greater than $133,000, but Plaintiffs' Counsel are not requesting that full amount) plus recovery of their out-of-pocket expenses. Neither Defendants nor any of the Plaintiffs oppose or dispute such application.

**Conclusion**

This Settlement was reached as a result of contested litigation and resolves a bona fide dispute between the parties under the FLSA. The parties investigated and analyzed the facts and law and reached a reasonable settlement given the risk to which each side was exposed. The settlement is fair, reasonable, and adequate, and provides all Plaintiffs with significant relief taking into account the costs, burdens, risks, and delays of further litigation. For these reasons, and those set forth above, Plaintiffs respectfully request that the Court approve the Settlement.

Dated: May 24, 2019.

<div style="margin-left: 40%;">

Respectfully submitted,
By: */s/ Boyd A. Byers*
Boyd A. Byers, KS Bar No. #16253
Forrest T. Rhodes, Jr., KS Bar No. 19567
Foulston Siefkin LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Tel. (Direct): 316-291-9796
Fax: 866-559-6541
bbyers@foulston.com
frhodes@foulston.com

*Attorneys for Plaintiff*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2019, I electronically filed the above and foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<div style="margin-left: 40%;">

*/s/ Boyd A. Byers*
Boyd A. Byers, KS Bar No. #16253

</div>